**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Bobby Der ENSLIN, aka Bobby De Enslin, Bobby Enslin D, Defendant–Appellant.**

No. 02–50087.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 5, 2002.

Filed Jan. 13, 2003.

Amended April 24, 2003.

Vincent J. Brunkow, Federal Defenders of San Diego, Inc., San Diego, CA, for the defendant-appellant.

Patrick K. O'Toole, United States Attorney (when brief was filed), Carol C. Lam, United States Attorney (when opinion was filed), Jill L. Burkhardt, Assistant United States Attorney, San Diego, CA, for the plaintiff-appellee.

Jill Burkhardt, Assistant United States Attorney, San Diego, CA, for the plaintiff-appellee.

Before: D.W. NELSON and T.G. NELSON, Circuit Judges, and SCHWARZER,* District Judge.

### ORDER

The Opinion filed January 13, 2003, slip op. 331, and appearing at 315 F.3d 1205, is amended as follows:

1.  At slip op. 344 [315 F.3d at 1213], line 4, insert the following footnote after "During their search,":

The officers had lawful consent to search the entire house to look for a dangerous fugitive for whom they had an arrest warrant. They had not yet completed their search. Thus, the officers were lawfully in the room when they found Enslin. Accordingly, Enslin's reliance upon *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), is misplaced. *Buie* held that an officer must have reasonable suspicion to search previously unsearched areas of a house when the officers were present to execute an arrest warrant and they had already found and arrested the suspect. *Id.* at 334, 110 S.Ct. 1093. In reaching this conclusion, the Supreme Court relied on the fact that the officers had already accomplished what they set out to achieve. Thus, their justification for

being in the house (to execute the arrest warrant) had evaporated. *Id.* at 332–33, 110 S.Ct. 1093. In this case, the officers were lawfully in the room when they found Enslin because they had not completed their search. Second, in balancing the Fourth Amendment interests, the *Buie* Court concluded that entering into previously unsearched rooms was not *de minimis.* *Id.* at 333–34, 110 S.Ct. 1093. In this case, as we have described above, ordering Enslin to show his hands was a minimal intrusion.

2.  At slip op. 343 [315 F.3d at 1212], footnote 29, insert the following at the end of the first paragraph, line 3 from the bottom:

Thus, Enslin's reliance upon cases that require reasonable suspicion for a *Terry* stop is misplaced. *See United States v. Flippin,* 924 F.2d 163, 167(9th Cir.1991) (requiring reasonable suspicion before an officer may forcibly remove a bag from the possession of an occupant during a consent search). These cases do not involve *de minimis* intrusions into individual liberty.

3.  At slip op. 345 [315 F.3d at 1212], footnote 33, line 1, insert "in oral argument" after "Contrary to Enslin's assertion".

With these amendments, the panel has voted unanimously to deny the petition for panel rehearing and the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R.App. P. 35.

---

* The Honorable William W Schwarzer, Senior District Judge for the Northern District of California, sitting by designation.

The petition for rehearing and the petition for rehearing en banc are DENIED.

## OPINION

T.G. NELSON, Circuit Judge.

Bobby Der Enslin appeals his criminal conviction for being a felon in possession of a firearm.[1] He contends that the district court wrongfully denied his motion to suppress evidence from a warrantless search and evidence obtained after he was seized unlawfully. He further contends that the indictment was fatally flawed because it failed to allege a *mens rea* for his felon status. We affirm because we conclude that (1) even if the person who voluntarily consented to the search did not have authority to consent, the U.S. marshals appropriately relied upon her apparent authority; (2) the seizure imposed a *de minimis* obligation upon Enslin to show his hands while the marshals searched the room; and (3) *United States v. Miller*[2] is controlling authority in this circuit, and it appropriately rejected any *mens rea* requirement for the felon status element of the felon in possession statute.

## I. FACTS AND PROCEDURAL HISTORY

Enslin was truly in the wrong place at the wrong time. Seven U.S. marshals were searching for a fugitive named Mickey Bass to execute an arrest warrant. Relying upon a tip that Bass had frequented John and Shannon Palacios' house, they approached the house dressed in plain clothes.[3]

At a subsequent suppression hearing, the marshals testified about the ensuing events. They knocked and identified themselves to Larry Chance, Shannon Palacios' brother. When Shannon Palacios subsequently joined Chance at the door, they asked her if Bass was there and when she replied that he was not, they requested permission to search the house. Shannon Palacios gave them consent to search the house: she did not limit her consent to any part of the house or give any indication that she could not consent to their search of any part of the house, although the marshals admitted that she did not give them particularized consent to search the back bedroom where they subsequently found Enslin. The marshals also admitted that they did not tell her that she had a right not to consent or read her the *Miranda* warnings.

The marshals entered the house and began searching for Bass. Two of them, Deputy Marshals Maddry and Kitts, went down the hallway and into the back bedroom. Although the back bedroom door had a key lock, there is no indication in the record that the door was locked. When the marshals entered the room, Enslin was in bed, apparently having just awakened from sleep. Enslin's hands were concealed underneath the covers.

Concerned for their safety while they searched the room for Bass, Maddry and Kitts ordered Enslin to show his hands. The record indicates that the marshals likely had their hands on their weapons at the time. When Enslin put his hands in the air and began to sit up, his movement shifted the covers and the marshals could see a gun in the bed next to him. The marshals drew their weapons and placed Enslin under arrest. Only later did they

---

1. 18 U.S.C. §§ 922(g)(1), 924(a)(2) (2002).

2. 105 F.3d 552 (9th Cir.), *cert. denied*, 522 U.S. 871, 118 S.Ct. 186, 139 L.Ed.2d 125 (1997).

3. It is possible that the marshals' guns and badges were visible at their waists. The marshals knew that John and Shannon Palacios resided at the house.

learn that Enslin was on parole. He was charged subsequently and convicted of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

Shannon Palacios testified at the suppression hearing and contradicted some of the marshals' testimony. However, her testimony was confusing and inconsistent, and she was unable to remember many things about the events of that morning. She stated that she did not meet the marshals at the door: they just came into her home. Furthermore, she testified that she did not give consent to search (although she could not remember whether the marshals asked for consent).

During the previous three months, she had rented the back bedroom to a man named Pat Dicker. Shannon Palacios never entered the room when Dicker lived there. However, she was having trouble getting Dicker to leave, so she enlisted the help of Enslin, who stayed in Dicker's room at her request. Enslin had only stayed for a few nights in the back bedroom, and he did not pay rent or have any sort of lease agreement with the Palacios. Dicker slept in the back bedroom as recently as three nights prior to the search. Along with some items belonging to Enslin, the back bedroom contained furniture owned by the Palacios as well as some personal belongings that Dicker had yet to remove. The district court expressed concern over the credibility of Shannon Palacios' testimony.

John Palacios also testified at the suppression hearing. He was in the front bedroom watching television when the marshals entered. Despite the fact that the front door was very close to his open bedroom window, he did not hear any conversation between the marshals and Chance or Shannon Palacios until Chance said "cops." When he walked out of his bedroom, the marshals were in the living room.

The district court determined that Shannon Palacios consented to the search and that she had authority to do so. According to the court, Enslin did not have a reasonable expectation that Shannon Palacios could not allow others to enter the room because he was staying in a room that contained the furniture and belongings of a third party. The court further determined that the gun was in plain view once Enslin moved his hands from under the covers. Therefore, the court refused to suppress the gun. Finally, the court denied Enslin's motion to dismiss the indictment for failure to allege a *mens rea* requirement for his felon status.

## II. JURISDICTION AND STANDARD OF REVIEW

Enslin timely appealed his criminal conviction. Therefore, we have jurisdiction pursuant to 28 U.S.C. § 1291.

■ We review a district court's refusal to grant a motion to suppress *de novo*.[4] Whether consent to search is voluntary depends upon the totality of the circumstances and is a question of fact that we review for clear error.[5] However, whether a person has apparent authority to consent is a mixed question of law and fact that we review *de novo*.[6]

■ We review whether an encounter between a defendant and law enforcement is a seizure *de novo* as a mixed question of

---

4. *United States v. Jones*, 286 F.3d 1146, 1150 (9th Cir.2002).

5. *Id.* at 1150, 1153.

6. *United States v. Reid*, 226 F.3d 1020, 1025 (9th Cir.2000).

law and fact as well.[7] Finally, when a defendant has properly objected, we review the sufficiency of the indictment *de novo*.[8]

## III. DISCUSSION

A. *The marshals searched the bedroom pursuant to consent from a resident with apparent authority to consent.*

Enslin contends that Shannon Palacios did not voluntarily consent and that, even if she did, she did not have actual or apparent authority to consent to the search of the back bedroom. Therefore, our analysis must proceed through several steps in order to address Enslin's claim on appeal. We will first address whether Shannon Palacios' consent was voluntary. Next, we will discuss her authority to consent.

1. *Enslin has not shown that the district court clearly erred in concluding that Shannon Palacios consented to the search voluntarily.*

■ Consent to search is a well-established exception to the Fourth Amendment's prohibition of warrantless searches of homes.[9] However, the consent must be voluntary, not a mere submission to an assertion of authority.[10] Although the

Government must show consent,[11] Enslin has a difficult burden to overcome in order to prevail on this appeal because the district court found that Shannon Palacios voluntarily consented, discounting her testimony to the contrary. The district court is in the best position to make credibility determinations, and Enslin has not shown any reason for us to conclude that the district court erred, let alone that the district court clearly erred,[12] in making this determination.[13] Thus, we conclude that the district court properly found that Shannon Palacios voluntarily consented to the search.

2. *Assuming that Enslin could show that the district court erred in concluding that Shannon Palacios had actual authority, she certainly had apparent authority to consent to the search.*

■ Voluntariness alone does not end our inquiry. The Government must also show that Shannon Palacios had either actual or apparent authority to consent to the search.[14] To establish apparent authority, the Government must show that: (1) the marshals believed an untrue fact that they used to assess Palacios' control of the back bedroom; (2) it was objectively

---

**7.** *United States v. Cormier,* 220 F.3d 1103, 1110 (9th Cir.2000).

**8.** *United States v. Pernillo–Fuentes,* 252 F.3d 1030, 1032 (9th Cir.2001).

**9.** *See United States v. Matlock,* 415 U.S. 164, 165–66, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

**10.** *See Reid,* 226 F.3d at 1025–26.

**11.** *Id.* at 1025.

**12.** *See United States v. Gilbert,* 774 F.2d 962, 964 (9th Cir.1985).

**13.** Furthermore, the factors that courts evaluate to determine whether consent was volun-

tary support the district court's conclusion. *See Reid,* 226 F.3d at 1026–27. The marshals did not have their guns drawn, and Shannon Palacios was not in custody; in fact, she was never arrested. *See United States v. Morning,* 64 F.3d 531, 533 (9th Cir.1995) (upholding district court's consent determination despite the fact that officers did not read the *Miranda* warnings and did not inform defendant that they could get a search warrant because officers did not draw their guns and the occupants were not placed under arrest).

**14.** *See Reid,* 226 F.3d at 1025.

reasonable for the marshals to believe that the fact was true; and (3) if the fact was true, Palacios would have had actual authority to consent.[15]

■ Assuming Palacios did not have actual authority, the Government made the necessary showing to establish that she had apparent authority. The marshals knew that John and Shannon Palacios were the residents of the house. The marshals did not know or have reason to believe that the Palacios rented the back bedroom in the past or that Enslin was staying in the back bedroom. A person who identified herself as Shannon Palacios came to the door in response to their arrival and gave them unlimited permission to search the house. Therefore, even assuming that Shannon Palacios did not have actual authority to consent, it was objectively reasonable for the marshals to rely upon her consent to search the back bedroom.[16]

Enslin relies upon *United States v. Reid* to argue that just because Shannon Palacios answered the door and appeared to live in the house, does not show that she had apparent authority because "the mere fact of access, without more, does not indicate that the access was authorized."[17] However, a close analysis of the facts of *Reid* shows that Enslin's reliance is misplaced.

In *Reid*, "the surrounding circumstances . . . were such that a reasonable person would not presume, without further inquiry, that [the person who answered the door] resided in [the] apartment."[18] The officers knew who resided at the apartment and knew that the person who answered the door was not the resident.[19] The person who answered the door did not know whose car was consistently parked in the space assigned to the apartment: a further indication that the person answering the door did not live in the apartment. Finally, the name of the person who answered the door was not one of the names listed on the lease documents in the officers' possession. In light of these circumstances, the *Reid* court concluded that a reasonable officer would not have believed that the person who answered the door resided in the apartment and had authority to consent.[20]

The factual discrepancies present in *Reid* that should have alerted the officers to a problem with the purported consent to search contrast sharply with the facts of this case. The only circumstance that Enslin can identify to undermine the marshals' belief in Shannon Palacios' authority is that the back bedroom had a key lock. However, the record suggests that the door was not locked, and the presence of a key lock alone, without more, is not sufficient to bring this case within the realm of *Reid*.[21] Therefore, the district court appropriately denied Enslin's motion to suppress the evidence obtained during the consent search.

15. *Reid*, 226 F.3d at 1025.

16. *See id.*

17. *Id.* (internal quotation marks omitted).

18. *Id.*

19. *Id.* at 1026.

20. *Id.* at 1025.

21. *See United States v. Fiorillo,* 186 F.3d 1136, 1144 (9th Cir.1999) (holding that consenting party had apparent authority to allow a search of a locked back room when there was no indication prior to the search that the room was leased, the consenting party gave a key to the officials, and there was no sign or other indication on the door to the leased room).

B. *The marshals' order to Enslin to show his hands imposed only a de minimis obligation upon him and does not require suppression of the gun that was then in plain view.*

Enslin asserts that he was seized without reasonable suspicion when the marshals ordered him to show his hands as they entered the back bedroom. Therefore, Enslin contends that the district court should have suppressed the gun that the marshals saw when Enslin complied with their order. To address this claim, we must determine whether the marshals' order constituted a seizure under the Fourth Amendment and, if so, whether it was nonetheless reasonable under the circumstances. We answer both inquiries in the affirmative.

1. *The show hands order constituted a seizure under the Fourth Amendment.*

■ The Government argues that the marshals' order to Enslin to show his hands did not constitute a seizure pursuant to the Fourth Amendment. We disagree. "The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest."[22] The appropriate inquiry is whether the marshals' order "in some way restrain[ed]" Enslin's liberty such that a reasonable person under the circumstances would not have felt free to

disregard the order.[23] Even if the official interference with an individual's liberty is brief, provided that it is some sort of "meaningful interference ... with an individual's freedom of movement," it constitutes a seizure.[24]

We think that the show hands order was a "meaningful interference" with Enslin's freedom. He had his hands covered and two armed marshals ordered him to reveal his hands. A reasonable person in Enslin's situation would not have felt free to ignore the request of the marshals, who likely had their hands on their weapons when they gave the order.[25] Therefore, the marshals' order to Enslin to show his hands constituted a seizure within the meaning of the Fourth Amendment.

2. *The show hands order did not violate the Fourth Amendment because it was not an unreasonable seizure.*

■ Our conclusion that the show hands order was a seizure does not end the inquiry, "[f]or the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable."[26] The marshals' order to Enslin to show his hands, although technically a seizure, does not violate the Fourth Amendment because it was not an unreasonable seizure under the circumstances. The obligation placed upon Enslin to reveal his hands for officer safety during the search

**22.** *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

**23.** *United States v. Chan–Jimenez,* 125 F.3d 1324, 1326 (9th Cir.1997).

**24.** *United States v. Jacobsen,* 466 U.S. 109, 113 n. 5, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (stating that "the 'seizure' of a person within the meaning of the Fourth Amendment [is] meaningful interference, however brief, with an individual's freedom of movement");

*see also United States v. Bailey,* 628 F.2d 938, 940 (6th Cir.1980) ("[T]he fourth amendment does not overlook de minimis intrusions.").

**25.** *See Chan–Jimenez,* 125 F.3d at 1326(considering fact that officer had his hand on his weapon as an indication that a reasonable person in the defendant's circumstances would not have felt free to leave).

**26.** *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

for a fugitive·was *de minimis* and thus constitutionally reasonable.[27]

■ Any inquiry into the reasonableness of a seizure requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."[28] In this case, that balance affirmatively favors the Government's interest in officer safety, leading us to conclude that the marshals' order was constitutional. On Enslin's side of the balance, requiring an individual to reveal his hands does force him to show a part of his person that was otherwise concealed. However, the nature and quality of the intrusion.are minimal.[29]

On the Government's side of the balance, we have the substantial and important interest in preserving officer safety.[30] The marshals were searching an unfamiliar residence for a fugitive. During their search,[31] they came across an unknown

---

**27.** *Cf. Michigan v. Summers*, 452 U.S. 692, 697–98, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (noting that "some seizures significantly less intrusive than an arrest have withstood scrutiny under the reasonableness standard embodied in the Fourth Amendment" when "the intrusion on the citizen's privacy was so much less severe than that involved in a traditional arrest that the opposing interest[ ] ... in the police officer's safety could support the seizure as reasonable") (internal quotation marks omitted); *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir.2001) (concluding, pursuant to Fourth Amendment reasonableness standard, that "[s]ome bodily intrusions may be ... de minimis and thus constitutionally reasonable").

**28.** *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (internal quotation marks omitted).

**29.** *See Maryland v. Wilson*, 519 U.S. 408, 413–15, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (concluding that the change in status resulting from the officer's order to a vehicle passenger to exit the vehicle during an otherwise lawful stop is minimal); *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam) (holding that additional intrusion into driver's liberty caused by officer's order to driver to exit a lawfully stopped vehicle was *"de minimis"*); *see also Rise v. Oregon*, 59 F.3d 1556, 1559 (9th Cir.1995) (holding, in the penal context, that gathering even an individual's genetic information "does not constitute more than a minimal intrusion upon ... Fourth Amendment interests"). Thus, Enslin's reliance upon cases that require reasonable suspicion for a *Terry* stop is misplaced. *See United States v. Flippin*, 924 F.2d 163, 167 (9th Cir. 1991) (requiring reasonable suspicion before

an officer may forcibly remove a bag from the possession of an occupant during a consent search). These cases do not involve *de minimis* intrusions into individual liberty.

Although Enslin argues that cases such as *Mimms* and *Wilson* are inapplicable because Fourth Amendment jurisprudence recognizes a distinction between the main branch of Fourth Amendment cases and those cases involving vehicles, this argument is overstated. Enslin is correct that Fourth Amendment doctrine has developed particular rules for cases dealing with vehicles; however, the differences between the vehicle cases and the main branch of Fourth Amendment jurisprudence are not significant in this context. *See Wilson*, 519 U.S. at 414, 117 S.Ct. 882(analyzing a vehicle stop Fourth Amendment question by analogizing to a non-vehicle case, *Michigan v. Summers* ). Because the vehicle cases use precisely the same Fourth Amendment balancing test as we use here, the rationale and analysis remain applicable even though the details of the balance may change because of the particular mobile nature of vehicles and an individual's legitimate expectations of privacy within vehicles. *See Wilson*, 519 U.S. at 413–15, 117 S.Ct. 882; *Mimms*, 434 U.S. at 108–11, 98 S.Ct. 330.

**30.** *See Wilson*, 519 U.S. at 413, 117 S.Ct. 882("On the public interest side of the balance, the same weighty interest in officer safety is present regardless of whether the occupant of the stopped car is a driver or passenger."); *Mimms*, 434 U.S. at 110, 98 S.Ct. 330(concluding that the interest in preserving officer safety during a traffic stop was "both legitimate and weighty").

**31.** The officers had lawful consent to search the entire house to look for a dangerous fugi-

adult male. They knew the man was not the fugitive, and requested that he reveal his hands.

In *Michigan v. Summers*, the Supreme Court held that, during a house search, "the risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." [32] Further, in *United States v. Garcia*,[33] we held that officers may restrain an individual by placing him against a wall even during a consent search of a house while the officers completed a protective sweep.[34] Compared to restraining an individual up against a wall during a protective sweep, it is clear that merely requiring an individual to show his hands while the marshals complete their search of a single room is a less significant intrusion into the individual's liberty.

Therefore, upon conducting the required balancing of interests pursuant to the Fourth Amendment, we conclude that the balance substantially favors the Government's interest in preserving officer safety during a consent search for a fugitive. Enslin does have a minimal liberty interest in keeping his hands beneath the covers while the marshals searched the room, just as a driver or passenger in a vehicle has a minimal liberty interest in remaining inside the vehicle during the stop. However, similar to the "mere inconvenience" of being ordered out of the vehicle,[35] being required to show one's hands is simply too small an intrusion into Enslin's liberty to overcome the weighty interest in protecting officer safety. Because the marshals' order to Enslin to show his hands was a

tive for whom they had an arrest warrant. They had not yet completed their search. Thus, the officers were lawfully in the room when they found Enslin. Accordingly, Enslin's reliance upon *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), is misplaced. *Buie* held that an officer must have reasonable suspicion to search previously unsearched areas of a house when the officers were present to execute an arrest warrant and they had already found and arrested the suspect. *Id.* at 334, 110 S.Ct. 1093. In reaching this conclusion, the Supreme Court relied on the fact that the officers had already accomplished what they set out to achieve. Thus, their justification for being in the house (to execute the arrest warrant) had evaporated. *Id.* at 332–33, 110 S.Ct. 1093. In this case, the officers were lawfully in the room when they found Enslin because they had not completed their search. Second, in balancing the Fourth Amendment interests, the *Buie* Court concluded that entering into previously unsearched rooms was not *de minimis. Id.* at 333–34, 110 S.Ct. 1093. In this case, as we have described above, ordering Enslin to show his hands was a minimal intrusion.

**32.** *See Summers,* 452 U.S. at 695, 702–03, 101 S.Ct. 2587. Although *Summers* involved a search pursuant to a search warrant rather

than a consent search to execute an arrest warrant, much of the analysis remains applicable. It is possible that the danger to officers during a consent search is less than that posed during a search pursuant to a search warrant, but the danger is not eliminated. Additionally, the intrusion into the liberty of the individual in *Summers* was greater than the intrusion posed by the marshals' request to Enslin to show his hands. *See id.* (upholding officers' authority to require individual exiting the house at the time officers arrived to execute the warrant to reenter the house and remain during the search).

**33.** 997 F.2d 1273 (9th Cir.1993).

**34.** *Garcia,* 997 F.2d at 1277, 1281–82. Contrary to Enslin's assertion in oral argument, the analysis in *Garcia* does not rest upon a finding that the officers had probable cause to arrest Garcia when they pushed him against a wall. Rather, the court found that Garcia consented to the search, he "was not unreasonably restrained when he was placed against the wall" during the protective sweep, and he was not arrested (pursuant to probable cause) until the officers saw the gun in plain view during the protective sweep. *Id.* at 1282.

**35.** *Mimms,* 434 U.S. at 111, 98 S.Ct. 330.

constitutionally reasonable seizure, the district court correctly refused to suppress the gun that the marshals saw in plain view after Enslin complied with their order.

### C. *No* mens rea *is required for the felon status element of the felon in possession statute.*

██ Enslin argues that his indictment was fatally flawed for failure to allege a *mens rea* for the felon status element of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). However, in *United States v. Miller*, this court held that the knowledge requirement of 18 U.S.C. § 924(a) "only applies to the possession element of § 922(g)(1), not to . . . felon status." [36] In an attempt to avoid the clear requirements of precedent, Enslin urges us to call for en banc review of *Miller*, contending that *Miller*'s holding should be reconsidered in light of *Staples v. United States*[37] and *United States v. X–Citement Video, Inc.*[38] *Staples* and *X–Citement Video* implied a knowledge requirement into certain criminal statutes to avoid criminalizing a vast range of otherwise innocent conduct when the defendant would have no reason to suspect that the conduct might be problematic.[39]

We decline Enslin's invitation to call for en banc review of *Miller*. The cases upon which *Miller* relied explicitly considered and rejected, after a thorough analysis, the application of *Staples* and *X–Citement Video* that Enslin urges us to adopt.[40] *Miller* was correctly decided.

Attempting to bolster his argument, Enslin relies upon *United States v. Wilson*[41] for support. However, a thorough analysis of *Wilson* shows that Enslin cannot garner support from that case. In *Wilson*, the defendant made a due process argument contending that he had no notice of the statute.[42] In rejecting that contention, the court mentioned in passing that the defendant "has not argued that he did not have knowledge of the actions constituting the offense (i.e., that he was possessing a gun in his car and was subject to an order of protection)." [43] Such a brief assertion, without supporting analysis, does not provide substantial support for Enslin's argument. Further, even if *Wilson* can be read to directly support Enslin's argument, this court has held, under similar factual circumstances to *Wilson*, that a defendant need not have knowledge that his possession violates the law.[44] Therefore, the district court appropriately refused to dismiss the indictment.

### IV. CONCLUSION

The marshals came across Enslin during a constitutionally valid search of the house.

---

**36.** *Miller*, 105 F.3d at 555.

**37.** 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994).

**38.** 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994).

**39.** *E.g., Staples*, 511 U.S. at 602, 114 S.Ct. 1793(holding that the National Firearms Act must be read to include a knowledge requirement, not only that a person possessed the firearm, but that the person knew of the characteristics of the weapon that brought it within the statutory definition of a machine gun).

**40.** *Miller*, 105 F.3d at 555(relying upon *United States v. Capps*, 77 F.3d 350, 352–53 (10th Cir.), *cert. denied*, 518 U.S. 1027, 116 S.Ct. 2568, 135 L.Ed.2d 1084 (1996), and *United States v. Langley*, 62 F.3d 602, 604–08 (4th Cir.1995) (en banc), *cert. denied*, 516 U.S. 1083, 116 S.Ct. 797, 133 L.Ed.2d 745 (1996)).

**41.** 159 F.3d 280 (7th Cir.1998).

**42.** *Id.* at 289.

**43.** *Id.*

**44.** *United States v. Kafka*, 222 F.3d 1129, 1131–33 (9th Cir.2000).

The district court appropriately concluded that Shannon Palacios' consent was voluntary. Even if Enslin could show that she did not have actual authority to consent, she certainly had apparent authority to consent to the search. When the marshals encountered Enslin and ordered him to show his hands, the order did amount to a seizure under the Fourth Amendment; however, it was a reasonable seizure. Therefore, the district court appropriately refused to suppress the gun the marshals found in plain view when Enslin raised his hands. Finally, we decline Enslin's invitation to call for en banc review of *Miller:* an indictment need not allege a *mens rea* for felon status pursuant to 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

AFFIRMED.